Bobby WILLIAMS, Plaintiff-Appellant,

v.

Larry BENNETT, et al.,
Defendants-Appellees.

No. 81–7037.

United States Court of Appeals,
Eleventh Circuit.

Oct. 29, 1982.

Rehearing Denied Dec. 20, 1982.

Robert L. Wiggins, Charles M. Quinn, Bryan & Appell, Birmingham, Ala., Kelso Jones, Asst. Atty. Gen., Medical Services Administration, Montgomery, Ala., for plaintiff-appellant.

James R. Seale, Montgomery, Ala., for all defendants-appellees except Cook.

Stephen Glassroth, Montgomery, Ala. (Court Appointed), for Cook.

Before HILL and HATCHETT, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

On January 10, 1978 in the Holman Prison in Atmore, Alabama, appellant Bobby Williams was assaulted by fellow inmate Larry Cook while Williams was sleeping in his dormitory bunk. Cook inflicted multiple stab wounds which rendered Williams a permanent quadriplegic. At the time of the incident, the dormitory housed medium security prisoners, and no prison guards were stationed either inside or outside the dormitory.

Williams filed a damage action in the district court under 42 U.S.C. §§ 1983, 1985, and 1986 and the eighth and fourteenth amendments against the Alabama Board of Corrections and its members, the Board's commissioner and deputy commissioner, the warden and deputy wardens of Holman Prison, and the captain and assistant captain of the guards at the prison, all in their official and individual capacities. Williams alleged that his personal injuries were the result of the deprivation of his right under the eighth amendment to be free from cruel and unusual punishment and of his right under the fourteenth amendment to be free from deprivation of life, liberty, and property without due process of law.[1] The complaint also named Larry Cook as an individual defendant, alleging a state law assault and battery claim.

Prior to trial the district judge granted partial summary judgment in favor of the Alabama Board of Corrections and all other defendants, except Larry Cook, in their *official* capacities on the basis of their eleventh amendment immunity. Just after commencement of trial the state law claim against defendant Cook was dismissed for lack of subject matter jurisdiction. At the close of the evidence the court granted a directed verdict for the captain and assistant captain of the guards. A jury verdict was rendered in favor of the remaining defendants in their individual capacities and Williams appeals.

For the reasons developed below, we conclude that:

(1) The district court properly dismissed the proceedings against defendant Cook.

(2) The court properly held that, under the eleventh amendment, the Board of Corrections and other defendants, insofar as they were sued in their official capacities, were immune from damage liability.

(3) Prior litigation established that Williams was confined in violation of the eighth amendment and that his injuries, being the result of foreseeable peril, were at least concurrently caused by that wrongful deprivation of constitutional freedom.

(4) The injunction issued in the prior litigation is of no moment insofar as it anticipated an expected date of compliance. Although relevant to contempt proceedings, the time allowance in the injunction did not vary appellees' duties under the Bill of Rights.

(5) The defense of good faith qualified immunity is not available to appellees because prior litigation put them on notice that the conditions of confinement at the prison were unconstitutional.

(6) In order to recover, however, Williams must prove that one or more of

* Honorable Irving L. Goldberg, U. S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. On appeal he contends that these violations are actionable not only under the Civil Rights Act of 1871—specifically 42 U.S.C. §§ 1983, 1985, and 1986—but also directly under the Constitution. With respect to the availability of an implied cause of action against state officials directly under the eighth and fourteenth amendments, see part VI, C., *infra*.

the individual defendants acted with such callous indifference to Williams' safety as to amount to constitutional wrongdoing, and that such wrongdoing produced the constitutional deprivation. Evidence that an individual defendant had neither the authority nor the resources to prevent the deprivation is material to this issue.

(7) The district court improperly instructed the jury that the state could not be compelled to pay any part of a judgment in favor of Williams.

(8) Williams may not maintain a *Bivins*-type action under the eighth amendment in addition to his claims under section 1983.

(9) The direction of a verdict in favor of defendants Chancery and Raines is reversed. Their liability *vel non* should be reappraised in light of our conclusions as to the applicable principles.

## I PROLOGUE

In order to appraise the legal setting in which the case was tried we must direct our attention to a prior class action under 42 U.S.C. § 1983 involving conditions in the Alabama Penal system. In *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd with modifications sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *rev'd in part sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978), the district court held that living conditions in Alabama prisons, including exposure to the constant threat of violence from other inmates, constituted cruel and unusual punishment in violation of the eighth amendment. The court concluded that, by housing inmates "in virtually unguarded, overcrowded dormitories, with no realistic attempt ... to separate violent, aggressive inmates from those who are passive or weak," the Alabama prison system had failed to carry out its constitutional duty to provide inmates reasonable protection from the constant threat of violence. *Id.* at 329. Accordingly, the court entered injunctive relief against, *inter alia,* the commissioner, deputy commissioner, and members of the Board of Corrections in their individual and official capacities, "their agents, employees, successors in office and any other acting in concert with them." *Id.* at 331. The decree directed that only minimum custody inmates be assigned to dormitories and that at least one guard be stationed inside and one guard outside the dormitories at all times. *Id.* at 333.

The district judge who entered the injunction in 1976 conducted hearings in September, 1978 to determine the extent of compliance with the *Pugh* order. The judge's findings and conclusions therefore covered the conditions in the Alabama prisons at the time of the incident upon which the current action is based. Having reviewed the evidence of efforts toward compliance, the court held that "[t]he very fact of confinement in Alabama's Penal System continues to contravene the Eighth and Fourteenth Amendment rights" of the inmates. *Newman v. Alabama,* 466 F.Supp. 628, 630 (M.D.Ala.1979). With respect to the state's duty to provide inmates reasonable protection from violence, the court observed:

Defendants admit noncompliance with the requirement that guards be stationed in the living areas, including dormitories. The dormitories, they say, are too dangerous for the guards to enter. That fear is well taken. The number of reported incidents of prosecutable crimes of violence shows a steady increase over the last four years ....

The Board has not taken the first steps to curb the pattern of violence which makes a mockery of the Eighth Amendment's protection against cruel and unusual punishment. The Board has *deliberately* ignored the requirement that

guards be stationed in the dormitory units at night.

*Id.* at 632 (emphasis added).[2]

## II THE INSTITUTION EXITS

The *Pugh* litigation determined that the conditions of Williams' confinement denied him the protection afforded prison inmates by the eighth amendment and that the cruel and unusual punishment thus inflicted was his constant exposure to the very sort of violence he experienced. The Alabama Penal System, as an institution, was being unconstitutionally operated. Williams attempted to sue the institution itself by naming as defendant the Board of Corrections and its officials and employees in their official capacities. If these defendants were proper parties for a damage suit, his task would have been far easier. However, on the basis of the eleventh amendment's acknowledgement of sovereign immunity, the district court entered a partial summary judgment in favor of the Alabama Board of Corrections and its officials and employees insofar as they were sued in their official capacities. Williams now challenges the application of sovereign immunity on two grounds. Initially, he argues that the Board of Corrections should not be considered the "state" for eleventh amendment purposes. In the alternative, he argues that a recent Alabama statute should be construed as a partial abrogation of any immunity the Board may have enjoyed previously.

2. Based upon its findings and conclusions that substantial compliance with the *Pugh* injunction had not been achieved and that the eighth amendment violation persisted, the court placed the Alabama prison system under the governance of a federal receiver. *Newman v. Alabama,* 466 F.Supp. 628, 636 (M.D.Ala.1979).

3. The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state or by citizens or subjects of any foreign state.
U.S.Const. amend. XI.

4. Independent local political subdivisions are not entitled to eleventh amendment immunity.

The eleventh amendment[3] has evolved to stand for the proposition that an unconsenting state is immune from damage suits brought in federal court by its own citizens or by citizens of another state. *Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 39 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The amendment effectively bars such actions for monetary relief even when the state is not named as a party. If the judgment necessarily will be paid from the state treasury, and the state is the real party in interest, then the state may invoke its sovereign immunity. *Id.* 415 U.S. at 664, 94 S.Ct. at 1356; *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). Although Williams maintains that the Board of Corrections is amenable to suit because it is political subdivision operating independent of the state,[4] his argument is precluded by the Supreme Court's decision in *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978). In *Alabama v. Pugh,* the Court concluded:

> There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit.

438 U.S. at 782, 98 S.Ct. at 3057 (citation omitted).[5]

Recognizing that the Board and its officials may invoke the eleventh amendment

*Lake Country Estates, Inc. v. Tahoe Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979). *See generally Laje v. R.E. Thomason General Hospital,* 665 F.2d 724, 727 (5th Cir. 1982).

5. Williams argues that *Alabama v. Pugh* should not control because the Court stated, "Respondents do not contend that Alabama has consented to this suit ...." 438 U.S. at 782, 98 S.Ct. at 3057. Because the issue was not raised, he claims, it should not be given stare decisis effect. A more complete reading of the Court' opinion, however, reveals that Alabama properly raised the issue on appeal and that it was not contested because such a contest would prove futile:

when sued in their official capacity, we turn now to plaintiff's contention that the state has since elected to waive its constitutional immunity by consenting to such suits. In 1979, the Alabama legislature enacted a statute in which the state agreed to pay up to $100,000 for judgments awarded against officials and employees of the Board of Corrections. Ala.Code § 41–9–74 (1981 Supp.).[6] Williams maintains that by enacting this statute the legislature intended to effectuate a limited waiver of eleventh amendment immunity. We disagree.

 Waiver of a state's eleventh amendment immunity can be found only when evidenced "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909).); *accord Florida Department of Health & Rehabilitative Services v. Florida Nursing Home Association*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132

(1981). In evaluating the statute for evidence of waiver, we therefore begin with an analysis of its language. The introductory paragraph of section 41–9–74 states that Alabama will pay final judgments awarded against Board officials in suits arising out of official acts "[a]s part of the consideration of the employment or appointment" of the individuals. Ala.Code § 41–9–74(a) (1981 Supp.). This language suggests that the statute was designed to be an employment benefit, analogous to liability insurance, for any Alabama correctional employee who may be sued individually for acts arising in the course of employment. *Cf. Reeves v. City of Jackson*, 608 F.2d 644, 654 n.6 (5th Cir. 1979) (a state municipality does not waive its immunity by purchasing liability insurance). Section 41–9–74 makes no mention of suits against the state or against the Board itself as an independent political body. Instead, the statute indicates that its indemnity provision runs to individuals by specifically listing those employees who may claim the benefit of its coverage. In addition, the provision that awards will be paid only to the extent that coverage is not

Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, § 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Moreover, the question of the State's Eleventh Amendment immunity is not merely academic. Alabama has an interest in being dismissed from this action in order to eliminate the danger of being held in contempt if it should fail to comply with the mandatory injunction.
*Id.*

6. Board to pay judgments against board of corrections officials; limitations, exceptions, etc.
(a) As part of the consideration of the employment or appointment of the commissioner of the board of corrections, deputy commissioners of the board of corrections, members of the board of corrections and other officers, employees and agents of the board of corrections, whether part time or full time, the board of adjustment shall pay all final judgments awarded in courts of competent jurisdiction against the aforesaid commissioner, deputy commissioner, members of the board of corrections, officers, employees and agents, for acts

arising out of and performed in connection with their official duties in behalf of the state of Alabama, except to the extent that such coverage may be provided by an insurance carrier.
(b) Payment shall be limited to a maximum of $100,000 for all claims arising out of the same act.
(c) No part of this section shall be admissible evidence in any court of law wherein any of the officers or persons indemnified herein are parties. Nothing in this section shall be deemed to waive the sovereign immunity of the state with respect to a claim covered under this section or to authorize the payment by the state of any judgment or settlement against the aforesaid commissioner, deputy commissioner, members of the board of corrections, officers, employees and agents, to the extent that the same exceeds the sum of $100,000.
(d) The provisions of this section shall not apply to the commissioner, any deputy commissioner, any member of the board of corrections and any other officer, employee and agent of the board of corrections who is found guilty of gross negligence or intentional or knowingly unlawful behavior.
Ala.Code § 41–9–74 (1981 Supp.).

provided by an insurance carrier suggests further that payments pursuant to the statute were intended to be nothing more than an insurance supplement for individuals, see Ala.Code § 41–9–47(a), and perhaps to afford some measure of relief to plaintiffs required to sue those who might otherwise be judgment proof individuals.

Williams relies most heavily on paragraph (c) of the statute by arguing that the legislature considered sovereign immunity, but decided to waive its protection insofar as a particular judgment did not exceed $100,000. This construction of the statute, however, ignores a clause which alters the meaning of paragraph (c). The relevant language reads as follows:

"Nothing in this section shall be deemed to waive the sovereign immunity of the state with respect to a claim covered under this section or to authorize the payment of any judgment or settlement against aforesaid commissioner, deputy commissioner, members of the board of corrections, officers, employees and agents, to the extent that the same exceeds the sum of $100,000.

Id. § 41–9–74(c) (emphasis added). We are not persuaded that this provision expresses the intent of the legislature to waive sover-

eign immunity; rather, the legislature appears to reaffirm Alabama's sovereign immunity and simply to limit payments made pursuant to the statute to $100,000.

Our construction of section 41–9–74 is consistent with Alabama's traditional reluctance to waive its sovereign immunity. For example, the Alabama Constitution unequivocally states "That the State of Alabama shall never be made a defendant in any court of law or equity." Ala.Const. art. I, § 14. Moreover, the Alabama Supreme Court consistently maintains that "[s]ince our Constitution unequivocally prohibits suits against the state, the legislature may not consent to such a suit."[7] Armory Commission v. Staudt, 388 So.2d 991, 992 (Ala. 1980); accord Druid City Hospital Board v. Epperson, 378 So.2d 696, 697 (Ala.1979); Dunn Construction Co. v. Board of Adjustments, 234 Ala. 372, 175 So. 383 (1937). Because of Alabama's unequivocal affirmation of sovereign immunity, and because section 41–9–74 fails to represent a clear expression of intent to waive that immunity in federal court,[8] we hold that the Board may not be subject to suit; however, while its officials and/or employees may not be sued in their official capacities, they are, individually subject to suits for acts or omissions in connection with their official

7. Williams attempts to disclaim such pronouncements by the Alabama Supreme Court by referring to that portion of the Alabama Constitution vesting with the legislature the power and duty "to enact all laws necessary to give effect to the provisions of this Constitution." Ala.Const. art. XVII, § 282. In an exercise of this power, Williams maintains that the legislature has excluded the Board of Corrections from the protection of sovereign immunity by subjecting the Board and its officials to "all legal restrictions, limitations, conditions and penalties, civil and criminal . . . ." Ala. Code § 14–1–10 (1975). This argument fails, however, because section 14–1–10 was in effect at the time the Supreme Court determined that the Alabama Board of Corrections could invoke eleventh amendment immunity. Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978). At that point, the Court concluded that apparently the Alabama legislature could not waive the state's sovereign immunity. 438 U.S. at 782, 98 S.Ct. at 3057. We also note that section 14–1–10 was modified by a 1979

act by the legislature which abolishes the Board of Corrections and transfers all responsibilities and liabilities to the Governor of Alabama. Ala.Code § 14–1–15 (1981 Supp.). To the extent that section 14–1–10 may be inconsistent with the new organization of Alabama's penal system it no longer has effect. Id. Nevertheless, Williams urges us to read section 14–1–10 in conjunction with section 41–9–74 to find the requisite evidence of intent to waive sovereign immunity. Because such a reading fails to provide us with a clear expression of the intent to waive the constitutional protection, we reject the argument.

8. At least one federal circuit has ruled that the waiver must extend explicitly to suits in federal court. Montana v. Peretti, 661 F.2d 756, 758 (9th Cir. 1981) (citing Florida Dep't of Health & Rehabilitative Services v. Florida Nursing Home Ass'n, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981).).

duties. The grant of partial summary judgment is affirmed.

### III DEFENDANT COOK. EXITS

The district court dismissed the assault and battery claims against defendant Larry Cook for lack of subject matter jurisdiction. On appeal, Williams urges that Cook's dismissal was improper because the court had pendent jurisdiction over these state law claims. We disagree.

 A federal court may exercise pendent jurisdiction over state law claims by parties properly before it, provided the federal and state law claims derive from a common nucleus of operative fact and that adjudication of the state claim will not prove inconvenient or unfair to the litigants or unduly burden the proceedings. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Jackson v. Stinchcomb,* 635 F.2d 462 (5th Cir. 1981); *Silva v. Vowell,* 621 F.2d 640 (5th Cir. 1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981). Implicit in the traditional concept of pendent jurisdiction is that the court already has jurisdiction over all the parties involved, whether because they are diverse or because a substantial federal claim has been asserted against the defendant. Here, however, Cook was not a diverse party. Nor was any substantial federal claim asserted against him. Because Cook is not a state official, he was not involved in the section 1983 claim. Moreover, Williams failed to proffer sufficient evidence to maintain that Cook and state correctional officials conspired to deprive Williams of his constitutional rights in violation of 42 U.S.C. § 1985(3) (1976). *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Crowe v. Lucas,* 595 F.2d 985 (5th Cir. 1979).

 Accordingly, the only possible source of jurisdiction over the state law claim against Cook lies in the nascent concept of pendent party jurisdiction. Under this theory, a court in some limited circumstances may bring in "state" parties over which it could not otherwise exercise jurisdiction. *See Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1377 n.7 (5th Cir. 1980); *Boudreaux v. Puckett,* 611 F.2d 1028, 1030–31 (5th Cir. 1980); *see, e.g., Connecticut General Life Insurance Co. v. Craton,* 405 F.2d 41 (5th Cir. 1968). The exercise of such pendent party jurisdiction turns on judicial economy considerations and whether " . . . Congress has expressly or impliedly negated the existence of jurisdiction of a pendent claim or party." *Boudreaux,* 611 F.2d at 1031.[9]

The exercise of pendent party jurisdiction already has been rejected in the context of diversity jurisdiction. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). Although we recognize that the policies supporting federal question jurisdiction differ from those supporting diversity jurisdiction and thus may compel a different approach to pendent party jurisdiction in federal question cases, *see generally* Note, *A Closer Look at Pendent and Ancillary Jurisdiction: Toward a Theory of Incidental Jurisdiction,* 95 Harv.L.Rev. 1935, 1942–43 (1982), we need not resolve the issue. The exercise of pendent jurisdiction is a discretionary decision reserved to the district court. *See Jackson supra,* 635 F.2d at 472–73; *Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir. 1981). As such, the district court was in the best position to determine if joinder of the state law claim against Cook would interfere

---

**9.** As the Supreme Court explained in *Aldinger:*

> If the new party sought to be joined is not otherwise subject to federal jurisdiction, there is a more serious obstacle to the exercise of pendent jurisdiction than if parties already before the court are required to litigate a state-law claim. Before it can be con-

cluded that such jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence.

427 U.S. at 18, 96 S.Ct. at 2422.

with the disposition of Williams' federal civil rights claim. We are not faced here with a case of a federal court accused of exercising jurisdiction beyond that authorized by Congress. Instead, we are presented with a case where a trial judge, acting within his discretion, chose not to exercise pendent party jurisdiction and deferred to state courts resolution of the state law claim of assault and battery.[10] In light of the tenuous nature of pendent party jurisdiction and its emphasis on judicial economy, we conclude that the court acted within its discretion in dismissing defendant Cook.

## IV THE CASE REMAINING

With Cook dismissed from the suit and the Alabama Prison System immune from damage liability, Williams is left with claims against the remaining defendants in their individual capacities. Because of the *Pugh* decision, proof of actionable wrongdoing by the prison system, in its corporate form, would appear to have been a straightforward matter. The case remaining against the individuals working in various capacities in the system, however, is far more complicated. Thus, before we evaluate the effect of *Pugh* on the remaining case, we find it important to focus on the nature of Williams' prima facie case under 42 U.S.C. § 1983 for violation of his eighth amendment rights.[11]

■ "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stat-

ure." *Wright v. El Paso County Jail,* 642 F.2d 134, 136 (5th Cir. 1981). *Accord Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir. 1981) (per curiam). To establish a deprivation of his eighth amendment rights, Williams therefore must bear the burden of proving deliberate indifference on the part of each of the defendant officials to his need for reasonable protection from violence. Only this degree of disregard for a prisoner's rights "can offend 'evolving standards of decency' in violation of the Eighth Amendment" and can separate official conduct that is actionable under section 1983 from simple negligence which is not actionable under section 1983. *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.

■ Section 1983 imposes additional proof requirements when that statute is used as the vehicle to vindicate substantive constitutional rights. The statute provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... *subjects, or causes to be subjected,* any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The italicized language plainly requires proof of an affirmative causal connection between the actions taken by a particular person "under color of state law" and the constitutional deprivation. *See Monell v. Department of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (causation require-

---

10. Williams also maintains that, even if the court did not have subject matter jurisdiction, the fact that Cook's dismissal came after two days of testimony was prejudicial to Williams' case. We find no merit in this position. The district court clearly explained to the jury that Cook's dismissal did not reflect on Williams' claims against the other defendants or against Cook himself for that matter. The court stated that the claim against Cook was brought in

good faith, but would be better adjudicated in a state court. Record, at 904–06.

11. The eighth amendment's ban on cruel and unusual punishment was first made applicable to the states by virtue of the fourteenth amendment in *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

ment precludes imposition of vicarious liability on municipality for acts of its employees absent proof that execution of official policy inflicts injury); *McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir. 1981) (per curiam); *Rheuark v. Shaw,* 628 F.2d 297, 305 (5th Cir. 1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981).

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court expounded on the nature of the causal link which must be established. Under review in *Rizzo* was the entry of injunctive relief against the mayor, police commissioner, and other officials of the City of Philadelphia in a section 1983 action alleging a pervasive pattern of police mistreatment of minority citizens and of Philadelphia residents in general. The Court reversed the judgment of the district court, finding fault with the theory of liability upon which it was based. Specifically, the Court disapproved the imposition of liability for the officials' failure to act in the face of a statistical pattern of police misconduct absent proof that the supervisory defendants had "*direct responsibility* for the actions" of those police officers who had engaged in the misconduct. *Id.* at 375–76, 96 S.Ct. at 606 (emphasis added). The former Fifth Circuit also has elaborated on the necessary causal link between officials' acts or omissions and the constitutional deprivation. "'Personal participation' is only one of several theories which can be used to establish causation .... Another theory ... is that a supervisory defendant is subject to § 1983 liability when he breaches a duty imposed by state or local law, and this breach causes plaintiff's constitutional injury." *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir. 1976) (citations omitted). From *Rizzo* and *Sims* it is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation.

Thus, in order to prevail against any one of the individual defendants, Williams must prove the following:

1. That being confined in a dormitory with inmates other than minimum security inmates without guards being present deprived him of his eighth amendment right to be free from cruel and unusual punishment because of the danger of violence.

2. That the individual defendant intentionally, or by callous indifference, was a cause of the constitutional deprivation.

3. That this deprivation was a legal cause of his injuries.

Williams contends that the *Pugh* litigation collaterally estops defendants from relitigating the issue of whether he (and other inmates of Holman Prison) was deprived of his right to be free from cruel and unusual punishment by exposure to violence. For this reason, Williams continues, the district court erred in admitting evidence of defendants' good faith attempts to comply with the dictates of the *Pugh* injunction. We agree only in part with Williams' argument.

## V *PUGH* IN PERSPECTIVE

The *Pugh* litigation, the findings and conclusions of the court, and the injunctive relief granted, have been woven into this case from the start. It is from this perspective that we evaluate the principles of preclusion and their proper place in these proceedings.

### A.

 Preclusive effect will be given to the adjudication of an issue litigated in a prior proceeding if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action. *Stovall v. Price Waterhouse Co.,* 652 F.2d 537, 540 (5th Cir. 1981); *Johnson v. United States,* 576 F.2d 606, 615 (5th Cir. 1978). In the present case Williams seeks to estop the defendants from relitigating issues they

purportedly litigated and lost in the *Pugh* action, thus invoking the offensive use of collateral estoppel. In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court granted federal trial courts broad discretion to permit the offensive use of collateral estoppel,[12] indicating, however, that the exercise of this discretion is circumscribed by considerations of fairness to the defendant in foreclosing relitigation of an issue. *Id.* 439 U.S. at 331–32, 99 S.Ct. at 651–52. A trial judge may justifiably refuse to allow offensive use of collateral estoppel if the defendant did not have an incentive to litigate the issue vigorously in the prior proceeding or if the defendant did not have a full and fair opportunity to litigate it. *Id.* at 332, 99 S.Ct. at 652.

▆ Under the circumstances of this case we conclude that the defendant officials are collaterally estopped to relitigate the issue of whether the conditions and practices in Holman Prison violated Williams' eighth amendment right to be free from cruel and unusual punishment. The parties there actually litigated, and the district court necessarily decided, one of the same basic issues at stake in this action— namely, whether the conditions and practices to which Williams was exposed as an inmate of Holman, including the failure adequately to guard dormitories and to assign only minimum security prisoners to dormitories, amounted to cruel and unusual punishment. To state it more precisely, the *Pugh* decision forecloses relitigation on the issue of whether Williams was denied reasonable protection from violence. That decision, however, does not preclude litigation on the issue of the degree of culpability of each defendant—that is, whether each defendant exhibited "deliberate indifference," which was a producing cause of the eighth amendment violation.

We do not perceive an unfairness in estopping the defendants' relitigation of the eighth amendment issue. All of the current defendants—with the exception of the warden, deputy warden, captain, and assistant captain of the guards at Holman—or their predecessors in office were named defendants in the *Pugh* litigation.[13] In light of the serious constitutional violations alleged and the broad declaratory and injunctive relief sought in *Pugh,* the defendants had every incentive to litigate the eighth amendment issue fully and vigorously. The journey of the case through the appellate courts evidences the fact of their vigorous defense. *See Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *rev'd in part sub nom, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978). Moreover, there are no procedural opportunities in the present case that were unavailable to the *Pugh* defendants and of a kind that would be likely to alter the resolution of the eighth amendment issue. *See Parklane Hosiery,* 439 U.S. at 332 n. 19, 99 S.Ct. at 652 n. 19.

Although not stated with the desired precision, Williams' counsel did move ". . . for a directed verdict in regard to the question of cruel and unusual punishment." Record, at 1115. Indeed, the motion was somewhat lost among other motions which were far from deserved. Nevertheless, without suggesting that everything moved for in the same oration had merit, a directed finding of cruel and unusual punishment should have been made by the district court.

---

12. In *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Court announced the applicability of collateral estoppel to section 1983 actions. Although that case specifically upheld the defensive use of collateral estoppel, the Court cited with approval the preclusion principles of *Parklane Hosiery. Id.* 449 U.S. at 94, 101 S.Ct. at 414. The defendants in this appeal have not questioned the availability of offensive collateral estoppel in a section 1983 action.

13. Those officials not named as defendants in *Pugh* were nevertheless bound by the injunction as "agents, employees successors in office [or] any others acting in concert with" the named defendants. *Pugh v. Locke,* 406 F.Supp. at 331.

### B.

The degree of culpability of each of the individual defendants and his causal role in the physical injuries suffered by Williams as a result of his exposure to the constant threat of violence present us with a different matter. As we have pointed out above, only a gross deviation from the standard of care owed—specifically in this case a callous indifference to Williams' need for protection from violence—is actionable as an eighth amendment violation under section 1983. In our view, *Pugh* does not estop each of the current defendant officials from attempting to establish that he did not exhibit such deliberate indifference. Although the district judge involved in the *Pugh* litigation castigated the state for its failure to take seriously its responsibility for operating its prisons in conformity with constitutional mandates, at times referring to the deliberate disregard of steps ordered in the *Pugh* injunction, *see, e.g., Newman v. Alabama*, 466 F.Supp. 628, 632 (M.D.Ala. 1979), it is clear that *Pugh* did not resolve the state of mind or intent of any particular one of the current defendants in failing to perform acts within his official responsibility. Hence one of the prerequisites of collateral estoppel, identity of these issues in the prior and subsequent actions, is missing here. The district court's comments in *Pugh* addressed the corporate fault of the state officialdom with responsibility for operation of the Alabama penal system, not the existence of *individual* fault on the part of each of—or any one of—the current defendants.[14] The latter focus is critical here. For example, it would be unfair to penalize with personal monetary liability an individual Board of Corrections member whose vigorous efforts to hire sufficient prison guards, or to assign available guards so as adequately to staff the dormitories, were overruled by the contrary views of a majority of the Board. On the other hand, it would be highly relevant to the establishing of personal liability to introduce evidence that an individual defendant, having jurisdiction over an adequate number of guards and over Williams' dormitory at the time of the stabbing announced: "I'm not going to station a guard in that dorm. Those prisoners deserve what they can do to one another." Such matters remain to be litigated.

Accordingly, we conclude that *Pugh* has no preclusive effect on the issue of individual constitutional wrongdoing. Our examination of the *Pugh* litigation convinces us that the causation element in that case is not identical to the causation requirement at issue here. To be sure, as the language of section 1983 plainly requires, a causal connection between the constitutional deprivation and the defendants' acts or omissions is as much an element of liability for purposes of entering injunctive relief in *Pugh* as it is in the present damages action. *See, e.g., Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1979) (injunctive relief). It also is clear that the parties in *Pugh*, collectively, as the corporate officialdom, were in a position to end the constitutional violation. However, when individuals are being sued in individual capacities for damages for personal injuries, the causation inquiry must be more refined and focused than that undertaken in *Pugh*, where only declaratory and injunctive relief were sought for constitutional violations pervading an entire prison system. In *Pugh* the focus for causation purposes was on whether the combined acts or omissions of all state officials with some responsibility for operation of the Alabama penal system created living conditions in the prisons which violated the eighth amendment. Thus the approach of the district court in *Pugh* was broad and generalized. From that approach ensued a sweeping injunction against all officials with any responsibility

---

14. *Cf. Montana v. United States*, 440 U.S. 147, 164 n. 11, 99 S.Ct. 970, 979 n. 11, 59 L.Ed.2d 210 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of the procedures followed in the prior litigation.") (emphasis added).

with respect to the prisons' operation. By contrast, the critical causation issue here must be whether each individual defendant was in a position to take steps that could have averted the stabbing incident at Holman but, through callous indifference, failed to do so.[15] Resolution of this issue necessarily entails a very individualized approach, taking into account the duties, discretion and means of each defendant.

There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury.

We find support for our holding that *Pugh* has a preclusive effect on the eighth amendment issue but not on the issues of individual liability in a former Fifth Circuit case arising from a very similar factual background. In *Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), the plaintiff, a former prisoner in the Mississippi State Penitentiary, sued prison officials under 42 U.S.C. § 1983 for damages arising from, *inter alia,* a stabbing by a fellow inmate that had rendered him a permanent paraplegic. The plaintiff had participated in a prior prisoners' class action under section 1983 and other civil rights statutes against various state officials. *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), *aff'd,* 501 F.2d 1291, 1322 (5th Cir. 1974). In *Gates* the plaintiff class had secured broad declaratory and injunctive relief from, *inter alia,* violations of the inmates' eighth amendment rights through the officials' failure to provide adequate protection against physical assaults by other inmates. The district court's holding was affirmed on appeal, with the circuit court adopting the trial court's finding of fact and conclusions of law as its own. *Gates v. Collier,* 501 F.2d 1291, 1322 (5th Cir. 1974). On appeal of the plaintiff's subsequent damage action of personal injuries, the former Fifth Circuit was called upon to determine the effect of the prior *Gates* litigation on the plaintiff's case. The defendant officials argued that res judicata barred the plaintiff's entire damage suit because, as a member of the *Gates* class, he could have litigated the personal injury claim in the prior action. The plaintiff contended that the defendants were collaterally estopped by the *Gates* suit from attacking certain findings regarding the unconstitutionality of the prison conditions. The court rejected the res judicata argument for essentially the same reasons that prompt us to deny collateral estoppel on the deliberate indifference and causation issues and permitted collateral estoppel on the constitutionality of the prison conditions just as we do now. *See Bogard v. Cook,* 586 F.2d 399, 409 (5th Cir. 1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979).

### C.

▬ Despite the necessity of litigating each defendants' responsibility for the prison's condition, the *Pugh* findings preclude defendants' contention that the unconstitutional condition under which Williams was forced to live was not a proximate cause of his injuries. In reaching this conclusion, we distinguish between the individualized causation requirement (proof that a defendant contributed to the unconstitutional prison conditions), and the more generalized causation requirement (proof that the unconstitutional prison conditions contributed to Williams' injuries). Although the former remains to be litigated with respect to each individual defendant, the latter was litigated effectively in the prior suit.

In the absence of *Pugh,* proof of intentional wrongdoing by someone other than

---

**15.** A clear showing of lack of responsibility by one or more of the defendants would have had only incidental impact upon the real issue in *Pugh—i.e.,* grant of injunction vel non.

the defendant (in this case Cook) might put in issue the causal connection between the proven default of the defendant and the injury. However, *Pugh* was specific on this point. Confining medium and maximum security risk prisoners in a dormitory without the presence of a guard inevitably exposes each inmate to violent injury at the hands of other inmates. *Pugh,* 406 F.Supp. at 325, 329–30, 333; *see also Newman,* 466 F.Supp. at 632. It was because of this causal connection that the following requirements, *inter alia* were included in the *Pugh* order: (1) "[o]nly minimum custody inmates may be assigned to dormitories;" (2) "guards shall be stationed inside living areas, including dormitories, at all times;" and (3) "[t]here shall be at least one guard inside and one guard outside, all living areas at all times." 406 F.Supp. at 333. The *Pugh* case therefore determined that the defendant prison officials must have foreseen that mixed unguarded dormitories would fester violence, and that they had a duty to provide their inmates with reasonable protection. *See* 406 F.Supp. at 329; *see also Gates v. Collier,* 501 F.2d 1291, 1308–09 (5th Cir. 1974). Thus, if an individual defendant is shown to have caused Williams to be housed in this mixed and unguarded fashion, through intentional conduct or callous indifference, then such action or omission was one of the causes of Williams' injuries. Williams need not prove that a particular defendant must have foreseen the specific injuries suffered as a result of the assault.

### D.

Similarly, we extend the preclusive effect of *Pugh* to the qualified immunity or good faith defense of the individual defendants. When sued in their individual capacities for damages under section 1983, defendant officials generally may assert a good faith defense. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The pa-

rameters of this defense recently were clarified by the Supreme Court in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland,* 420 U.S. 308, 320 [95 S.Ct. 992, 999, 43 L.Ed.2d 214] (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official *"knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with malicious intention* to cause a deprivation of constitutional rights or other injury . . . ." *Id.,* at 321–322 [95 S.Ct. at 1000] (emphasis supplied).

102 S.Ct. at 2737. *Harlow* involved the good faith defense afforded presidential aides. After examining the policies underlying the immunity, the Court further refined the defense by holding "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* —— at ——, 102 S.Ct. at 2739 (citations omitted). Thus, objective criteria now govern the evaluation of a good faith defense.

To the extent that good faith is defined essentially in objective terms, if defendants should have known that their conduct in maintaining an unconstitutional prison violated Williams' rights, then their good faith defense will be defeated. In the context of

the present case, the *Pugh* order not only clearly defined the constitutional rights of the Alabama prisoners, but also served to put the defendant officials on notice of the continuing violations. As the court stated in *Pugh:*

In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court held that, under Section 1983, plaintiffs can recover money damages from state officials if the officials acted either in bad faith or in "disregard of settled, indisputable law." *Id.* at 321, 95 S.Ct. 992. To put it another way: a public official may be held liable where he, in subjective good faith, acts in disregard of a person's "clearly established constitutional rights." *Id.* at 322, 95 S.Ct. 992. The Court now acts in these cases with a recognition that prisoners are not to be coddled, and prisons are not to be operated as hotels or country clubs. However, this does not mean that responsible state officials, including the Alabama Legislature, can be allowed to operate prison facilities that are barbaric and inhumane. *Let the defendant state officials now be placed on notice* that failure to comply with the minimum standards set forth in the order of this Court filed with this opinion will necessitate the closing of those several prison facilities herein found to be unfit for human confinement.

406 F.Supp. at 331 (emphasis added). Thus, defendants are precluded from now asserting that they should not have known that failure to meet the constitutional norms established in *Pugh* would violate Williams' constitutional rights. Although this is not preclusion in the sense that the good faith defense was litigated in the earlier suit, the determination of a constitutional violation in *Pugh* effectively precludes the defense because of the court's clear delineation of the prisoners' rights.

In precluding the assertion of a good faith defense by an individual defendant, however, we do not disallow the admission of evidence demonstrating the subjective intent of a defendant. As discussed above, a claim alleging a constitutional deprivation of cruel and unusual punishment requires proof of deliberate or callous indifference on the part of each defendant. The focus of this inquiry necessarily centers on individual motives and reactions. Moreover, evidence tending to prove deliberate or callous indifference is the same evidence which would have been used to defeat a good faith defense under the subjective criteria. *Fielder v. Bosshard,* 590 F.2d 105, 110 (5th Cir. 1979); *see also Fowler v. Cross,* 635 F.2d 476, 482 (5th Cir. 1981); *Bogard v. Cook,* 586 F.2d 399, 412 (5th Cir. 1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). Because of the required proof of deliberate or callous indifference, therefore, the subjective good faith and intent of the individual defendants remain relevant even in light of the objectivity now associated with the good faith defense.

E.

■ Before closing our discussion of collateral estoppel, we find it necessary to comment on the distinction between the findings of the district court in *Pugh* and its subsequent injunction. *Pugh* has a preclusive effect on the present case because its findings established that the conditions at the prison constituted cruel and unusual punishment in violation of the eighth amendment at the time Williams was assaulted. Because the failure to maintain the prison in countenance with the constitution violated Williams' right to be free from cruel and unusual punishment, Williams need not prove that he was the victim of a constitutional violation. The obstacle now facing Williams is the attachment of legal responsibility for his injuries to one or more of the defendants. This will require proof of callous indifference.

Nevertheless, a defendant may not avoid liability by relying on the timetable seen as having been incorporated in the district

court's injunction in *Pugh*. Having made his findings in *Pugh,* the district judge may well have contemplated that a considerable period of time would be necessary to correct the deficiencies in the Alabama prisons. *See* 406 F.Supp. at 332. Defendants in this case appear to have successfully argued that they could not have been guilty of any wrongdoing in continuing unconstitutional conditions so long as the conditions were corrected within the time allowed by the *Pugh* injunction.[16] This simply is incorrect. The district judge in *Pugh* did not undertake to amend the constitution by suspending it for a certain period of time. The fact that the court did not require correction of the conditions by immediate mandatory injunction, does not absolve the state or the individual defendants of liability for constitutionally related injuries arising in the interim. Time given in an injunction is no license to exercise callous indifference for awhile. Although contempt may be avoided during this time, the possibility of liability continues to exist. Indeed, even in the absence of the *Pugh* case, an inmate who could prove injury resulting from unconstitutionally cruel and unusual punishment would have a viable cause of action. No one is permitted to violate the constitution until a judge has found the violation to exist, and, where one has been found to exist, no one is entitled to continue unconstitutional action, free of liability, until the time set in an injunction for its correction. It is the finding of unconstitutionality in *Pugh* which is relevant to the present case, not the correction time limits included in the *Pugh* injunction.

## VI JURY INSTRUCTIONS

Williams also raises a series of challenges to the jury instructions given by the trial court. He complains further that the court refused to give other relevant instructions. We address each of these challenges individually.

### A.

▮ Initially, Williams claims reversible error in the district judge's instruction that the jury could consider the lack of sufficient funds to comply with the *Pugh* order in deciding whether defendants used all reasonable effort to comply and acted in good faith. Lack of funds, he argues, is not a defense to a claim of deprivation of a constitutional right. *See Smith v. Sullivan,* 611 F.2d 1039, 1043–44 (5th Cir. 1980); *Williams v. Edwards,* 547 F.2d 1206, 1212–13 (5th Cir. 1977); *Wyatt v. Aderholt,* 503 F.2d 1305, 1315 (5th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974). Although defendants do not deny that lack of funds generally will not defeat a claim alleging a constitutional violation, they argue the unfairness of disallowing the defense when officials are sued in their individual capacities and are powerless to control legislative appropriations that would facilitate compliance.

Defendants clearly may not escape liability solely because of the legislature's failure to appropriate requested funds. In challenging the plaintiff's *prima facie* showing of callous indifference, however, an individual defendant certainly may present evidence of the limitations within which that defendant attempted to perform his duties at Holman Prison. One such limitation may have been the funding available to comply with the constitutional norms. Because the element of callous indifference focuses on a defendant's intent, *see Fielder v. Bosshard,* 590 F.2d 105, 109 (5th Cir. 1979), if full compliance is beyond the control of a particular individual, and that indi-

---

16. The district court even instructed the jury that this was a proper defense:

If you find that the defendants did not violate the Court's order with respect to the stationing of guards at Holman Prison or providing individual cells for medium securi-

ty prisoners because the order did not require such accomplishment by January 10, 1978, then the defendants would not be liable for such failure to accomplish compliance of the order by January 10, 1978.

Record, at 1238.

vidual can demonstrate that he accomplished what could be accomplished within the limits of his authority, then he cannot be said to have acted with callous indifference. *See Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974); *Slavin v. Curry,* 574 F.2d 1256, 1262 (5th Cir. 1978).

The issues raised in the present case are distinguishable from those raised in cases which generally adhere to the proposition that lack of funds is not a defense to a constitutional deprivation. This distinction lies in the difference between a suit for injunctive relief against a state and a suit for damages against an individual state employee. The assumption underlying rejection of the lack of funds defense is that a state is not required to operate a penitentiary system. If, however, a state chooses to operate a prison system, then each facility must be operated in a manner consistent with the constitution.[17] Thus, when a court is considering *injunctive* relief against the operation of an unconstitutionally cruel and unusual prison system, it should issue the injunction without regard to legislative financing. By such an injunction, however, the court does not order the prison to be operated; it merely enjoins its being operated in an unconstitutional manner. The state may undertake to operate its prison system in countenance with the constitution or it may choose to close it down. That choice is the state's and it is not dictated by the court. Accordingly, the State of Alabama was precluded from pleading lack of funds as a defense to operating prisons in violation of the constitution. *Pugh v. Locke,* 406 F.Supp. at 330–31.

In contrast, however, we are called upon to consider the liability of individual state employees for injuries suffered as a result of the unconstitutional conditions. Unlike the state, an individual defendant generally has neither the power to operate nor close down a prison. Moreover, we refuse to adopt the position that an employee who attempts to accommodate the constitutional rights of prisoners in his charge, within the financial limitations imposed, should, instead, resign from his position because of the realization that full compliance is impossible in the absence of adequate funding. Indeed, the corrections official who walks away could be said to act with greater indifference than those who remain and attempt to work within the system.

■ In essence, the availability of funds, or lack thereof, is relevant in determining whether the individual is capable of committing the constitutional wrong alleged. Although each prison employee owes a duty to the inmates affected by his function, that duty must be measured by the scope of his discretion and the extent of his authority. *See Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (quoting *Scheuer v. Rhodes,* 416 U.S. at 247–48, 94 S.Ct. at 1691–92.). For example, an individual defendant should be able to demonstrate that he had insufficient authority to correct the constitutional deficiencies in the prison. He also should be permitted to demonstrate that he did not have the resources necessary to correct that deficiency.

We are careful to note, however, that insufficient funds does not give rise to a separate defense. Evidence of the circumstances under which an individual defendant was required to perform his duties simply goes to the issue of callous indifference.

---

17. Perhaps the best illustration of this assumption is the oft quoted statement:

> If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

*Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark. 1970), *aff'd,* 442 F.2d 304 (8th Cir. 1971) (quoted in *Gates v. Collier,* 501 F.2d 1291, 1320 (5th Cir. 1974), and *Pugh v. Locke,* 406 F.Supp. at 330–31.); *see also Inmates of Henry County Jail v. Parham,* 430 F.Supp. 304, 305 (N.D.Ga. 1976) ("Having freely, voluntarily and wisely chosen to own and operate a jail, the people and officials of Henry County have entered into a sphere of governmental action properly burdened with some special responsibilities.").

To prove actionable conduct or callous indifference, Williams must demonstrate that a particular defendant had the capability (authority and means) to provide adequate security and did not do so. Stated another way, a defendant who was without the authority or means to provide the necessary security could rebut a charge of callous indifference.

## B.

Williams' second challenge to the district judge's instructions centers on the appropriate characterization of proximate cause. Rather than using the pattern instructions for proximate cause which had been requested by plaintiff,[18] the court instead referred to actions which "proximately caused or proximately contributed to the injury." The court's instruction, Williams claims, misled the jury by failing to draw attention to the fact that two independent acts, namely the failure of prison officials to comply with the *Pugh* order plus Cook's independent act of assaulting Williams, could combine to produce injury, and each defendant would be equally responsible. In addition, he argues, the jury may have been led to believe defendants could not be liable if the state legislature contributed to Williams injury by failing to appropriate adequate funds.

Before evaluating Williams challenge, it is important to again note the two levels of causation and the effect of collateral estoppel. Williams must prove that each individual defendant proximately caused the unconstitutional conditions in the prison.

Once this causal link is demonstrated his task is complete. Defendants are precluded from contending that the unconstitutional condition was not at least a proximate cause of Williams' injuries. *Supra,* part V, C. Nevertheless, in establishing the initial causal link, the proximate cause instruction of the district court remains crucial because the acts and omissions of many individuals may have combined to cause the unconstitutional conditions at Holman Prison.

Alabama law governs the definition of proximate cause in this case. *See* 42 U.S.C. § 1988. Accordingly, the instructions requested by Williams were adapted from Alabama Pattern Jury Instructions as approved by the Alabama Supreme Court. *See* Ala. Pattern Jury Instructions No. 28.-04, 28.05, 28.06 (1973). Each instruction was designed to explain clearly the established law of proximate cause in Alabama that an individual may be liable even when he is not the sole cause of the injuries. *See Watkins v. United States,* 589 F.2d 214, 219 (5th Cir. 1979) (applying Alabama law); *Alabama Power Co. v. Taylor,* 293 Ala. 484, 498, 306 So.2d 236, 249 (1975); *Lawson v. General Telephone,* 289 Ala. 283, 289, 267 So.2d 132, 138 (1972); *Chambers v. Cox,* 222 Ala. 1, 3, 130 So. 416, 418 (1930).

The district court, however, refused to use the requested instructions and instead made abstract references to "proximate contribution." Although the record indicates that the court understood the nature of proximate causation,[19] we cannot say that its instructions clearly explained to the jury the meaning of concurring causes. Nor did the court recognize the two levels

---

**18.** Plaintiff's Requested Jury Instructions Nos. 25 and 26 are representative of the proximate cause instructions requested by Williams:

CONCURRING AND COMBINING CAUSES DEFINITIONS
The acts or failures to act of two or more persons may concur and combine to proximately cause injuries and damages. Causes 'concur and combine' when they join to produce a given result. Adopted from Alabama Pattern Jury Instructions, # 28–04.
CONCURRING AND COMBINING CAUSES OF DEFENDANTS

If you are reasonably satisfied from the evidence in this case that all of the defendants' acts or failures to act concurred and combined to proximately cause the injuries and damages claimed by the plaintiff, then each defendant is liable to the plaintiff. Adapted from Alabama Pattern Jury Instructions, # 28–05.

**19.** *See* Record, at 1129–30.

of causation and the effect of collateral estoppel. For these reasons, its proximate cause instructions were inadequate. The better approach would have been to adapt the pattern instructions to level one causation by explaining concurring causes in terms of defendants' acts or omissions and the unconstitutional conditions at the prison.

## C.

Williams also assigns as error the trial court's refusal to instruct the jury that he could recover nominal damages without proof of actual injury for the denial of an absolute constitutional right. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (nominal damages are recoverable for a denial of due process without proof of actual injury). He claims that an absolute constitutional right is involved because he asserts claims directly under the eighth and fourteenth amendments, as well as under the civil rights statutes. Accordingly, he claims two errors: first, that the court failed to instruct the jury on his alleged direct constitutional action, and second, that no reference was made to the possibility of nominal damages.

Williams' direct constitutional violation theory is premised on the implication of a *Bivins*-type right of action under the eighth and fourteenth amendments of the Constitution. *Bivins v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Although the Supreme Court has implied a direct right of action under the eighth amendment against federal officials, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), a similar right of action should not be implied against state officials. When Congress has provided an adequate alternative remedial scheme, which is intended to be a substitute for direct recovery under the constitution, a *Bivins*-type action is inappropriate. *Id.* at 18–19, 100 S.Ct. at 1472; *Davis v. Passman,* 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979); *Bivins,* 403 U.S. at 397, 91 S.Ct. at 2005. In implying a direct right of action against federal officials in *Carlson,* the Court explained that the plaintiff's only alternative right of action, suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(h), was intended to complement rather than replace a direct constitutional action. 446 U.S. at 19–23, 100 S.Ct. at 1472–74. In contrast, Williams' alternative remedy under section 1983 against the state officials provides an adequate substitute for direct action under the eighth and fourteenth amendments. *See Dean v. Gladney,* 621 F.2d 1331, 1336–37 n. 14 (5th Cir. 1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981); *Hearth, Inc. v. Department of Public Welfare,* 617 F.2d 381, 382–83 (5th Cir. 1980). Because "the inquiry is whether Congress has created what it views as an equally effective remedial scheme," 446 U.S. at 22, 100 S.Ct. at 1474, we conclude that the effectiveness of Williams' claim under section 1983 precludes the implication of a direct constitutional action under the eighth and fourteenth amendments against state officials.[20] The trial court therefore correctly refused to instruct the jury on this claim.

---

**20.** In *Carlson,* the Court articulated four reasons why the FTCA was an inadequate substitute for a direct constitutional action: ineffective deterrence, no provision for punitive damages, no provision for jury trials, and extensive reliance on non-uniform state law. 446 U.S. at 21 23, 100 S.Ct. at 1473–74. Actions brought under § 1983, on the other hand, permit suits directly against state officials in both their individual and official capacities and generally allow for punitive damages and jury trials. In addition, a plaintiff acting under § 1983 can rely on federal law at least insofar as defining the required constitutional deprivation. *See* 42 U.S.C. § 1988 (1976) (state law will be applied only insofar as it is not inconsistent with the Constitution and laws of the United States). The similarity between a direct constitutional claim and a suit under § 1983 is also evident from a defendant's perspective because both allow for a good faith defense. *Compare Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (good faith immunity for state officials) *with Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (good faith immunity for federal officials).

■ Similarly we find Williams' claim for nominal damages to be without merit and his reliance on *Carey v. Piphus, supra* misplaced. *Carey* stands for the proposition that once a plaintiff has successfully maintained a cause of action for a deprivation of constitutional due process, then nominal damages may be recovered in the absence of proof of actual injury. *See* 435 U.S. at 266, 98 S.Ct. at 1053. The problem in *Carey* was that plaintiffs had suffered a constitutional deprivation, but could not demonstrate actual injury from that deprivation. Williams, on the other hand, clearly has suffered actual injury which is attributable to the unconstitutional conditions at Holman Prison. His difficulty is in attaching individual responsibility for that deprivation. In the absence of individual responsibility, even nominal damages are not recoverable. *Cf. Familias Unidas v. Briscoe,* 619 F.2d 391, 402–03 (5th Cir. 1980) (a good faith defense will defeat a claim for nominal damages). If the requirements of individual callous indifference and causation are satisfied, then the issue of damage liability arises. At that stage of the litigation Williams can introduce evidence of his actual injuries in lieu of any claim for nominal damages.

### D.

■ Finally, included in the district judge's instructions was a statement that the State of Alabama could not be compelled to pay money judgments against officials sued in their individual capacity:

> There are now eight defendants who are sued as individuals in this lawsuit. Neither the State of Alabama nor the Board of Corrections is, itself, a party. These defendants were originally sued in their official as well as their individual capacities. The Court dismissed them in their official capacities because any damages awarded against them in their official capacities would have been against the state, and the state cannot be ordered to pay damages in such a case. Therefore, the defendants remain in this case solely in their individual capacities, and any damages awarded are against them as individuals, and the state cannot be required by law to pay such damages.

Record, at 1232. Not only was this statement irrelevant to the issues of liability and damages, *see* Fed.R.Evid. 411 (excluding evidence of liability insurance), but in light of section 41–9–74 of the Alabama Code,[21] which directs the Board of Adjustments to pay up to $100,000 to satisfy final judgments against corrections officials, it may well have been erroneous.

The existence of a collateral source of revenue to pay a judgment generally is excluded from evidence on two grounds. First, it simply has no bearing on the fault of a defendant. *See* 10 J. Moore, *Moore's Federal Practice* § 411.03. But more significantly, the absence or presence of a collateral source may induce a jury to decide a case on improper grounds. Advisory Committee's Note to Fed.R.Evid. 411. For example, if the court had informed the jury of the existence of section 41–9–74, the jury may have been more likely to hold defendants liable, believing that some of the loss would be paid by the state. *See Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751, 758 (3d Cir. 1976). On the other hand, the court's explicit statement that the state could not be required to pay may have created undue sympathy for defendants to the prejudice of Williams. *See* Fed.R.Evid. 403. Accordingly, we find that the instruction suggesting that the state could not be required to pay any part of the judgment against the defendant officials and employees sufficiently prejudiced Williams as to warrant reversal. The Court should have remained silent on the issue.

### VII DIRECTED VERDICT

Williams final objection questions the propriety of the directed verdict entered in

**21.** *Supra* note 6.

favor of defendants Raines and Chancery. Chancery was captain of the guard, but was not at the prison at the time of the assault. Raines, who normally was an assistant captain of the guard, was acting captain the day of the assault and was the first guard to arrive at the scene of the attack. We reverse the court's direction of a verdict to the extent that the liability of these two defendants should be reappraised in light of applicable principles set forth above.

For these reasons we REVERSE and REMAND this case for further proceedings consistent with this opinion.