**Gerald SHIFLET, Plaintiff,**

v.

**Warren W. CORNELL, et al., Defendants.**

**No. 94–390–CIV–FTM–17D.**

United States District Court, M.D. Florida, Fort Myers Division.

July 10, 1996.

Gerald Shiflet, Arcadia, FL, Pro se.

John P. Goshgarian, Attorney General's Office, Civil Division, Ft. Lauderdale, FL, for defendants.

### ORDER

KOVACHEVICH, District Judge.

Plaintiff, a Florida prisoner, initiated this action on December 12, 1994, by filing a civil rights complaint pursuant to 42 U.S.C. § 1983, naming four defendants: (1) Warren Cornell, Superintendent of Desoto Correctional Institution (hereinafter DCI); (2) J. Calkins, Supervisor of Nursing at DCI; (3) Sgt. Smith, a correctional officer at DCI; and (4) Nurse Davis, a senior registered nurse at DCI. On October 6, 1995, Defendants filed a Motion for Summary Judgment. (Doc. 25) On October 20, 1995, the Court, in accordance with *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir.1985), notified Plaintiff of the summary judgment rules, of his right to file affidavits or other materials in opposition to the motion, and of the consequences of default. (Doc. 26) Plaintiff filed a response to Defendants' Motion for Summary Judgment on November 8, 1995. (Doc. 29)

### Summary Judgment Standard

The Eleventh Circuit recently discussed the standard for granting summary judgment:

> Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993), *reh'g and reh'g en banc denied*, 16 F.3d 1233 (11th Cir.1994).

The Eleventh Circuit recognized the seminal case concerning summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) by highlighting the following passage:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Hairston*, 9 F.3d at 918.

Finally, the parties' respective burdens and the Court's responsibilities are outlined:

> The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy*, 816 F.Supp. 1553, 1556 (N.D.Ga. 1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom,

in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[,] 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The Court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted). *Id.* at 918–19. *See Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 589–90 (11th Cir.1994); *Howard v. BP Oil Co.*, 32 F.3d 520, 523–524 (11th Cir.1994).

In this case, Defendants are entitled to judgment as a matter of law for the following reasons.

### Plaintiff's Allegations

Plaintiff alleges the following facts:

12) On March 28, 1994, while Plaintiff was using the inmate restroom, the Plaintiff suffered a stroke.

13) An officer assigned to J Dorm, the Dorm the Plaintiff was residing in at the time of his stroke, saw the incident and called the institution's medical department.

14) After waiting for the medical department to arrive, and waiting for fifteen to twenty minutes, two inmates assisted the Plaintiff walking to the medical department under the supervision of the officer assigned to J Dorm.

15) While the Plaintiff was being carried to the medical department by the two other inmates, the Defendant Davis arrived with a wheelchair and placed the Plaintiff into it and brought him to the institution's medical department.

16) Upon arriving at the medical department, Defendant Davis took Plaintiff's vitals.

17) Plaintiff advised Defendant Davis that while the Plaintiff was using the inmate restroom, he felt an explosion like thing hit him in the right side of his head, and that after the explosion like thing occurred his whole right side became paralyzed.

18) Defendant Davis did not let the Plaintiff see a doctor when the Plaintiff made a request to see a doctor, as he stated to Defendant Davis "there is something wrong with me; my right side is paralyzed and my head is killing me, I need to see a doctor."

19) Defendant Davis refused to allow the Plaintiff to see a doctor and had the Plaintiff X–Rayed three times.

20) Plaintiff then saw Defendant Calkins, who drew blood from the Plaintiff and took urine samples.

21) Plaintiff told Defendant Calkins that he needed to see a doctor as his right side is totally paralyzed, and that his head was hurting him as well as his right eye.

22) Plaintiff also told Defendant Calkins that while he was standing using the inmate restroom in his Dorm, he felt an explosion in his right side of his head and that after the explosion in his head he saw

lights and his whole right side became paralyzed.

23) Defendant Calkins told the Plaintiff that there was nothing wrong with him, and that he needed to stop taking whatever drugs he has been taking or smoking out there on the inmate compound.

24) Plaintiff advised Defendant Calkins that he was not taking any drugs and that drugs did not do this to him.

25) Plaintiff then sat in the medical department for an hour until Defendant Smith came to get him.

26) Defendant Smith advised the Plaintiff that he was being placed into confinement for possession of unauthorized medications. At that time Defendant Smith attempted to handcuff the Plaintiff, but the Plaintiff's right arm was locked and unable to move.

27) Defendant Smith never attempted to get a wheelchair for the Plaintiff, even knowing that the Plaintiff could not walk, and forced the Plaintiff to half walk and half crawl to the confinement unit in K Dorm.

28) Two inmates seeing the Plaintiff in this condition assisted the Plaintiff to the confinement unit in K Dorm where the Plaintiff was placed.

29) Defendant Smith while in the medical department advised Defendant Davis and Calkins that the Plaintiff was on drugs, even though Defendant Smith was not a doctor nor has received any training in the medical field in this area. Nor did Defendant Smith run any tests upon the Plaintiff, but yet expressed a medical opinion as to the medical condition of the Plaintiff, and Defendants Davis and Calkins accepted this medical opinion from a lay person like Defendant Smith.

30) While the Plaintiff was in confinement, his roommate continuously requested medical treatment for Plaintiff.

31) A sergeant assigned to or working in the confinement unit advised the Plaintiff that if the Plaintiff was not any better by the time he came back to work the following morning, he would make sure the Plaintiff saw a doctor.

32) The following morning while a nurse from the medical department was making her rounds in the Administrative Confinement in K Dorm, she saw the Plaintiff and ordered the Plaintiff to be taken to the medical department at once.

33) Upon the Plaintiff arriving at the medical department, the nurse who saw the Plaintiff in the confinement unit took the Plaintiff's vitals and went to see the Chief Health Officer over the medical department.

34) The nurse came to get the Plaintiff and wheeled him into see the doctor.

35) The doctor advised the Plaintiff that he had a stroke and apologized to the Plaintiff and informed the Plaintiff that he was being taken to an outside hospital where he has a good doctor who is going to take care of the Plaintiff.

.        .        .        .

46) Defendant Smith ... threat[ened] to retaliate against the Plaintiff if the Plaintiff did in fact bring this lawsuit against the Defendant and the institution by advising the Plaintiff, if he did sue in court, the Plaintiff would be transferred to the Panhandles and the Plaintiff would run into a lot of problems before he went up before the parole board again.

.        .        .        .

50) The Plaintiff has suffered great pain and suffering due to the Defendants' action and is now paralyzed on his right side.

51) The Plaintiff is unable to work his right side to its fullest, and only has about 70% to 60% of his right side that is in some working order. This is the direct consequence of the Defendants in this cause, for their acts and omissions which presented a total disregard to the Plaintiff's well-being and safety.

(some grammatical corrections made for clarity).

Based on these facts, Plaintiff claims that Defendants Davis, Calkins, and Smith acted with deliberate indifference to his serious medical needs and that Defendant Smith attempted to impede his access to courts by threatening retaliation if Plaintiff filed a lawsuit based on the facts of this case. Plaintiff

claims that Defendant Cornell knew or should have known that the medical department at DCI routinely fails to provide adequate medical care to inmates and that Defendant Cornell approved of retaliation by prison officials against inmates who filed federal lawsuits.

### Discussion

#### A. Defendant Cornell

In his June 28, 1995, deposition, Plaintiff discussed why he named Superintendent Warren Cornell as a defendant in this action:

Q. Why are you suing Superintendent Cornell, Mr. Shiflet?

A. He's over at the institution and he should have known—

Q. I know what it says in your Complaint. In your own words, tell me what you think he did wrong.

A. Well, I think that—I think he's allowing too many inmates at this institution have complaints—medical complaints. And he's letting Medical tell the inmates that there's nothing wrong with them.

Then when they go back down there a month or two later, they found out something is actually wrong with them. He's got to be aware of this.

Q. He never came in personal contact with you though. Is that right?

A. No, sir.

Q. You never confronted him personally about any of your—about this alleged stroke or anything like that?

A. No, sir. All I know is he is the superintendent of the institution.

.        .        .        .        .

Q. You said he's being sued for approval of his subordinates threatening inmates such as plaintiff with retaliation if they were to file suit.

A. Right.

Q. Tell me when did you ever hear Mr. Cornell approve of his subordinates doing this conduct?

A. I never heard him approve of that, but—

Q. Did you ever hear him encouraging anybody?

A. No. I never heard him encourage anybody.

Q. Did you ever hear Mr. Cornell state that he would transfer anybody to another institution if they filed a lawsuit or anything like that?

A. I never heard him state anything like that.

Q. That he would be a hardship to the inmate's family if they came to see him? Did you ever hear him state that he would do that?

A. No, sir.

Q. Or disciplinary proceedings against inmates if they would file suit or use a grievance procedure in any manner?

A. No. I never heard him state anything like that.

Q. Or interfere with the parole or probationary status in the future?

Have you ever heard him say that or other inmates or other personnel that if inmates file lawsuits or use grievances, he would take that conduct?

A. No, sir.

Q. He never made that threat to you?

A. No, sir.

Q. He never made that threat to your classification officer?

A. Not to my knowledge.

(Ex. O, pp. 57–59)

In any 42 U.S.C. § 1983 action, the initial inquiry must focus on whether two essential elements to a § 1983 action are present:

1. whether the conduct complained of was committed by a person acting under color of state law; and

2. whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981); *Tillman v. Coley,* 886 F.2d 317, 319 (11th Cir.), *reh'g denied,* 893 F.2d 346 (11th Cir.1989) (en banc); *Barfield v. Brierton,* 883 F.2d 923, 934 (11th Cir.1989); *Cornelius v. Town of Highland Lake, Alabama,* 880 F.2d 348, 352 (11th Cir.), *reh'g denied,* 887 F.2d 1093 (11th

Cir.1989) (en banc), *and cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

The language of § 1983 "plainly requires proof of an affirmative causal connection" between the official act or omission complained of and the alleged constitutional deprivation. *Bailey v. Board of County Commissioners of Alachua County*, 956 F.2d 1112 (11th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992); *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *see also Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

The Eleventh Circuit has stated:

Like municipalities, supervisors cannot be held liable for the acts of employees solely on the basis of *respondeat superior*. Supervisory liability is not limited, however, to those incidents in which the supervisor personally participates in the deprivation. There must be a causal connection between the actions of the supervisory official and the alleged deprivation. This causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need for improved training or supervision, and the official fails to take corrective action.

*Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir.1985) (citations omitted). Further, the supervisory official can be liable where the misconduct was executed pursuant to an official policy or an informal practice promulgated by that supervisor. *Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir.1985).

[W]hen individuals are being sued in individual capacities for damages for personal injuries, the causation inquiry must be more refined and focused than that undertaken ... where only declaratory and injunctive relief [are] sought for constitutional violations pervading an entire prison system.

*Williams v. Bennett*, 689 F.2d at 1383.

In this case, Plaintiff does not allege that Defendant Cornell personally participated in the alleged constitutional deprivations. Although Plaintiff alludes in his complaint to existence of a history of widespread abuses at DCI that would have put Defendant Cornell on notice of a need for improved training or supervision, Plaintiff has not submitted any evidence whatsoever in support of this allegation. Furthermore, Plaintiff has not identified any official policy or informal practice promulgated by Defendant Cornell which resulted in the alleged deprivations. Plaintiff's allegation that Defendant Cornell approved of retaliatory actions against inmates who file federal lawsuits is completely undermined by Plaintiff's deposition testimony, set forth above, where Plaintiff acknowledges that he is not aware that Defendant Cornell ever encouraged or approved of retaliatory conduct by his subordinates. Thus, Plaintiff has failed to establish a causal connection between Defendant Cornell and the alleged misconduct; Plaintiff is attempting to hold Defendant Cornell liable based solely on a theory of respondeat superior which, as noted, is not available under 42 U.S.C. § 1983.

### B. Defendant Smith—Retaliatory Threats

Plaintiff claims that Defendant Smith attempted to impede his access to courts by threatening retaliation if Plaintiff filed a lawsuit based on the facts alleged in this case. Plaintiff addressed this issue in his June 28, 1995, deposition:

Q. Mr. Shiflet, you mention in your Complaint that defendant Smith is also being sued for his threat to retaliate against plaintiff—plaintiff didn't in fact bring forth this lawsuit against Sergeant Smith by advising him that if he did sue, he would be transferred to the Panhandle; and you'd be running into a lot of problems before you went before the Parole Board again.

A. Yeah. What happened when I got back from Foster (sic) [Medical Hospital], Sergeant Smith came back to the Confinement area. I said to him I had a stroke. He said, yeah, I heard. He said, things happen, and I said, I'm going to make sure this doesn't happen again. So he state to me leave well enough alone.

He said, you wear the blues, I wear the browns. Don't make me make things harder for you. And I said, how are you going to do that? And he stated to me I can cause problems. I know you're seeing the parole man.

Q. Was anybody else there when he made these statements? Anybody else hear these statements?

A. I forgot the guy's name. He's gone anyway.

Q. Did you tell Sergeant Smith that you were going to sue him personally?

A. I did tell him that. I stated I'm going to make sure this doesn't happen again; and I guess he took it like that.

Q. What else did he say to you?

A. He said, I can make it hard for you if you even think about a lawsuit.

Q. He said that specifically?

A. Yes. He said that—he said, I can make it hard for you. I can have you transferred to the Panhandle.

. . . . .

Q. ... Did Sergeant Smith make any other statements to you besides that? Mr. Shiflet, did he make any other statements to you besides those?

A. Not that I recall.

. . . . .

Q. Do you still see Sergeant Smith?

A. Yes. Every day.

Q. He knows he's being sued?

A. I would imagine so.

Q. Has he ever made any statements to you? Ever tried to harass you?

A. The only time he said anything to me was when I moved out of "E" dorm to "K" dorm.

He was working in that unit. He saw me going up the steps and he said, you living here? And I told him yeah. That's the only time he said anything to me.

. . . . .

Q. Okay. Do you have any present fear that anybody is going to retaliate you for filing this lawsuit?

A. You know that's the reason I moved out of "K" building. When I found out that Sergeant Smith had the building, I moved out.

Q. How about now at this time?

A. I feel safe, but when I was in "K" building I was on edge at all times.

Q. But no one tried to take any kind of action against you?

A. No, sir. No, sir.

(Ex. O, pp. 54–56, 74–75, 77)

█ It is clear from Plaintiff's own deposition that Plaintiff has not actually experienced any retaliation as a result of filing a lawsuit against Defendant Smith. Thus, even if Plaintiff's claim that he was threatened is true, and Defendant Smith specifically denies that it is (Ex. H, p. 3), Plaintiff's allegations constitute nothing more than a claim of verbal harassment which is not cognizable under § 1983. The Fifth Circuit has stated:

[A]s a rule, 'mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.... Were a prisoner ... entitled to a jury trial each time he was threatened with violence by a prison guard, even though no injury resulted, the federal courts would be more burdened than ever with trials of prisoner suits....'

*McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir.), *cert. denied,* 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983); *Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.1973).

*C. Medical Claims*

Plaintiff claims that Defendants Davis, Calkins, and Smith responded with deliberate indifference when he suffered a stroke on March 28, 1994, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff stated at his deposition that the sole basis for his medical claim is that he was not brought to a doctor immediately after he collapsed in the restroom on March 28, 1994.[1]

---

1. Plaintiff does not allege that Defendant Smith was aware of his injuries prior to his admittance to the medical department.

■ In assessing Plaintiff's claims of cruel and unusual punishment, the Court must consider "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Cruel and unusual punishment, however, only consists of a level of punishment that involves "the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976). Deliberate indifference to serious medical needs of prisoners constitutes "the unnecessary and wanton infliction of pain." *Id.*

■ Indifference may be manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976).

■ Although deliberate indifference to a serious medical need is a cognizable claim under 42 U.S.C. § 1983, not all complaints concerning medical treatment are actionable:

[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 106, 97 S.Ct. at 292 (footnote omitted). An inadvertent or negligent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be "repugnant to the conscience of mankind." *Id.* at 105–06, 97 S.Ct. at 292. Allegations of negligent conduct do not state a claim under § 1983. *Daniels v.*

*Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

■ Defendants have submitted medical affidavits, Plaintiff's medical records, Plaintiff's deposition transcript, and other documents in support of their Motion for Summary Judgment.[2] These documents indicate that Plaintiff collapsed in the restroom at DCI at 7:05 a.m., and that Plaintiff told the officer on duty, Officer Scarbrough, that he collapsed because his left leg gave way. (Ex. A) Officer Scarbrough noted that Plaintiff's eyes appeared glassy at the time of his collapse. *Id.* Plaintiff was treated by Defendant Davis upon his arrival at the prison emergency room. (Ex. B; Ex. C) Defendant Davis claims that Plaintiff told her that he struck the toilet with his left hip and that his left upper thigh was numb. (Ex. C) Defendant Davis noted that Plaintiff appeared to be under the influence of drugs and that he favored his left side when he walked. *Id.* Davis contends that Plaintiff never asked to see a doctor and that his only complaint was about his left hip. *Id.* Defendant Davis took Plaintiff's vital signs, examined his ears and the inside of his mouth, and performed a pin prick test on his left leg. *Id.*

Defendant Davis consulted with Dr. Dameff concerning her findings. (Ex. C; Ex. D) Based on Defendant Davis' report, Dr. Dameff recommended x-rays for Plaintiff's left hip and that blood and urine samples be taken for drug testing. *Id.* Defendant Davis asserts that Plaintiff denied using any drugs and consented to a blood test. (Ex. C) Plaintiff later acknowledged having smoked marijuana one or two days before the stroke. (Ex. D; Ex. O, p. 45) Blood and urine samples were taken by Nurse Calkins. (Ex. C; Ex. F) The results of tests on the samples showed positive levels of cannabinoids (marijuana). (Ex. D; Ex. N) After Defendant Calkins took Plaintiff's blood and urine samples, Defendant Davis notified Defendant Smith that Plaintiff appeared to be under the influence of drugs and requested that Defendant Smith search Plaintiff's locker and cell.

**2.** Documents submitted by Defendants in support of their Motion for Summary Judgment are indicated by the abbreviation Ex., followed by the exhibit letter.

(Ex. C; Ex. H) Defendant Davis then escorted Plaintiff to the x-ray department. (Ex. C) The x-rays revealed that Plaintiff's left hip was normal except for some very early osteoarthritic changes. (Ex. Q)

That same morning Defendant Smith found in Plaintiff's locker non-narcotic prescription drugs which had not been issued to Plaintiff by the medical department. (Ex. H) Defendant Smith was ordered by his supervisor to place Plaintiff in administrative confinement for this infraction of Department of Corrections rules. *Id.* Defendant Davis performed a pre-confinement physical, noting that Plaintiff's vital signs were normal, he was hyperalert, and he could walk but was favoring his left side. (Ex. C) Following the physical, Defendant Smith attempted to handcuff Plaintiff to take him to administrative confinement as required by Department of Corrections procedures, but Plaintiff complained of pain in his arm so Smith allowed him to walk to administrative confinement without handcuffs. (Ex. H) Plaintiff walked slowly but without assistance to administrative confinement at approximately 11:15 a.m. (Ex. H; Ex. L) Plaintiff stated at his deposition that he did not actually crawl to the confinement unit as alleged in his complaint but that he did drag his right leg with each step. (Ex. O, p. 30) Plaintiff did not ask Defendant Smith to obtain a wheelchair to transport him to the confinement unit. *Id.* at 32–33. Plaintiff later pled guilty to the possession of unauthorized drugs based upon the non-narcotic prescription drugs found in his locker on March 28, 1994. (Ex. J)

On March 29, 1994, at approximately 9:00 a.m., Plaintiff complained to the nurse on duty in administrative confinement, Nurse Kimbrell, that his right side was numb. (Ex. M) Nurse Kimbrell noted that Plaintiff's right arm was cool to the touch and hanging at his right side. *Id.* Nurse Kimbrell brought Plaintiff to the medical department, noting that Plaintiff required the assistance of a wheelchair. *Id.*

At approximately 12:30 p.m., Dr. Robert Lang examined Plaintiff who complained of numbness in his right side. (Ex. D; Ex. E) Dr. Lang noted mild to moderate incoordination of Plaintiff's right extremities. (Ex. E; Ex. M) Dr. Lang concluded that Plaintiff had suffered a mild stroke affecting the right side of his body on March 29, 1994, the day after he fell in the restroom. *Id.* Dr. Lang diagnosed the numbness in Plaintiff's left thigh on March 28, 1994, as left superficial femoral neuralgia unrelated to the stroke that affected the right side of Plaintiff's body. *Id.* Dr. Lang asserts that Plaintiff did not mention that he felt an "explosion in his right side of his head," as Plaintiff alleges in his instant complaint. (Ex. E) In fact, Dr. Lang asserts that Plaintiff's allegation of an explosion in his head is "ludicrous" because:

I [Dr. Lang] have never had a patient who was experiencing a stroke describe any head symptoms, other than a headache in rare instances. More frequently, it would be a complaint of weakness and/or numbness of one side of the face, and extremity, or an entire side of the body.

*Id.*

Following Dr. Lang's diagnoses, Plaintiff was sent to Fawcett Memorial Hospital in Port Charlotte, Florida, for further tests. *Id.* There he was treated by Dr. Nasir Khalidi and was diagnosed as having "acute left cerebral infarction—probable vasculitis." (Ex. P) With regard to the treatment Plaintiff received at the hospital, Dr. Dameff states:

The Plaintiff received only steroids and further medical tests at the hospital. At no time did he receive or ever need anticoagulants. The significance of this is as follows. The Plaintiff's stroke was *not* the result of a blood clot that broke off in his heart or one of his large blood vessels, which then became lodged in his brain. This type of stroke could require immediate intervention with anticoagulants. Rather, the Plaintiff's stroke probably resulted from the inflammation of a small blood vessel or small blood vessels (a condition known as vasculitis), which does *not* require anticoagulants.

(Ex. D)

Drs. Dameff and Lang give the following opinion:

In looking at the Plaintiff's record of medical treatment, some of which I observed and rendered, my opinion is that on March 28, 1994, Nurses Davis and Calkins provided Plaintiff with proper and effective care based on the symptoms they observed. . . . From the symptoms present-

ed on March 28, 1994, they could not have known that the Plaintiff was going to have a stroke (CVA) of the *left* side of his brain, that would result in problems on the *right* side of his body.

In my opinion, there was no deficiency in the diagnosis of the Plaintiff's medical problems on March 28, 1994. . . .

(Ex. D; Ex. E)

On July 21, 1995, Dr. Lang examined Plaintiff, noting only minimal residual effects from the stroke. (Ex. E; Ex. M) Plaintiff again complained of numbness in his left upper thigh which Dr. Lang concludes is superficial femoral neuralgia. Dr. Dameff notes that Plaintiff now "has almost no residual effects from the minor stroke (CVA)." (Ex. D) Dr. Dameff further states:

> [B]ecause of the type of stroke (CVA) the Plaintiff suffered, and his near complete recovery, the treatment he received on March 28 did not harm him. There really is no treatment that he could have received on March 28 that would have altered his current condition. In other words, even if Plaintiff's stroke (CVA) occurred on March 28, 1994, which I do not believe, a one day delay in hospitalization did not deprive him of essential treatment.

*Id.*

With regard to his present condition, Plaintiff stated at his deposition that as a result of the stroke it is difficult for him to hold steady with his right hand the tools of his trade, welding. (Ex. O, pp. 62–3) Plaintiff further stated that he cannot play as many sports as he used to, but he can jog and jump rope and he is getting stronger each day. *Id.*

Plaintiff has not submitted any medical evidence showing that the care he received on March 28, 1996, was not proper and effective. Nor has he shown that Defendant Smith's failure to obtain a wheelchair to transport him to the confinement area constituted deliberate indifference to his serious medical needs since by Plaintiff's own admission he was capable of walking slowly and did not request a wheelchair. Further, Defendant Smith's failure to take Plaintiff to a doctor rather than to the confinement area cannot be said to constitute deliberate indifference because, as noted in Defendants' Mo-

tion for Summary Judgment, a lay person would not recognize the necessity for a doctor's attention when a person has just been treated and released from an emergency room.

Plaintiff's dissatisfaction with the treatment he received amounts only to a difference in judgment about his medical needs. A difference of opinion over matters of medical judgment does not give rise to a constitutional claim. *Massey v. Hutto*, 545 F.2d 45 (8th Cir.1976). Plaintiff has alleged at most medical negligence or malpractice, the proper forum for which is state court. *See Estelle*, 429 U.S. at 107, 97 S.Ct. at 292–93.

### Conclusion

For the reasons set forth in this order, the Court orders:

Defendants' Motion for Summary Judgment (Doc. 25) is **GRANTED**. The Clerk shall enter judgment in favor of Defendants and close this case.

ORDERED.